UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                         :
ANDREW BLITZER,                          :      03 CIV. 6124 (DLC)
                    Plaintiff,           :
                                         :
         -v-                             :      OPINION AND ORDER
                                         :
JOHN E. PORTER, Postmaster General,      :
United States Postal Service,            :
                                         :
                    Defendant.           :
                                         :
----------------------------------------X

For plaintiff pro se:
Andrew Blitzer
2525 Batchelder Street
Brooklyn, New York 11235

For defendant John E. Porter:
David N. Kelley
U.S. Attorney for the Southern
District of New York

John P. Cronan
Assistant U.S. Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007


DENISE COTE, District Judge:

     On August 13, 2003, Andrew Blitzer filed this pro se action,

alleging that five employees of the United States Postal Service

("USPS"), Luciano Rivera, Frances Velazquez, William Andermann,

William McDonough, and Sandra Calo, discriminated against him on

the basis of his gender, physical appearance, and marital status,

in violation of Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e-16 ("Title VII").  Blitzer further alleges that he

was discriminated against on the basis of disability, in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 794a ("Rehabilitation Act"); that the USPS violated his constitutional rights to equal protection and due process; that certain employees retaliated against him for his criticism of former employers and his instigation of EEO proceedings; and that the Government is liable for breach of contract and invasion of privacy.

Following the conclusion of discovery, the Government has moved for summary judgment. For the reasons stated below, the Government's motion for summary judgment is granted.

## Background

The following facts are undisputed or taken in the light most favorable to the plaintiff, unless otherwise noted. By his own account, Andrew Blitzer ("Blitzer"), a 42-year-old Brooklyn resident, has encountered "interaction problems" throughout his employment history and is often perceived as "causing a commotion" in the workplace. Blitzer acknowledges that his "problem is, in some ways, peculiar to [him]" and that he "often succeed[s] in giving as much as [he] get[s]." Since his teenage years, Blitzer has been unable to obtain or maintain employment both because of his "status as an attractive male" and because of societal discrimination against unmarried men, who are perceived

as less responsible than their married counterparts and who bear the brunt of married coworkers' "jealousy and resentment" due to "their perceived freedom."

On March 4, 1998, Blitzer learned through materials sent to his parents' home that a "pre-screening orientation" for the position of letter carrier in the Bronx would be held on March 6 and that interested parties should report to the James A. Farley post office in Manhattan at 7:15 a.m.  The next day, Blitzer filled out a form offer of employment with the USPS.  The offer states in capital letters:

> THIS OFFER OF EMPLOYMENT IS CONTINGENT UPON YOUR MEETING THE SUITABILITY REQUIREMENTS FOR EMPLOYMENT WITH THE U.S. POSTAL SERVICE.
>
> SPECIFICALLY, IF DEROGATORY INFORMATION SUCH AS CRIMINAL CONVICTIONS (NOT INDICATED ON YOUR PS FORM 2591, APPLICATION FOR EMPLOYMENT) AND/OR UNSATISFACTORY EMPLOYMENT REFERENCES RELEVANT TO THE SUITABILITY REQUIREMENTS SHOULD DEVELOP, YOUR EMPLOYMENT WILL BE TERMINATED.

(Emphasis added.)  The form further provides in bold letters that "[T]HIS OFFER OF EMPLOYMENT IN NO WAY CONSTITUTES A WAIVER OF THE SUITABILITY REQUIREMENTS OF THE UNITED STATES POST OFFICE." Blitzer signed this form on March 5.

Among the above-referenced USPS suitability requirements is a provision that concerns an applicant's work history.  That requirement states that

> [a]n eligible may be eliminated from consideration for employment because of previous unsatisfactory service. This may include postal, private sector, or other

3

agency _employment_, including debarment by the Office of
Personnel Management.  The service must have been long
enough to be considered a full and fair trial, and the
character of the service must have been such that the
eligible is unlikely to be able to perform
satisfactorily in the new position.

(Emphasis supplied.)  In order to give context to the above-
quoted requirement, the USPS supplements it with a nonexhaustive
list of circumstances that may constitute "previous
unsatisfactory service."  These circumstances include an
"unstable work record."


The USPS Orientation

At approximately 7:20 a.m. on March 6, Blitzer arrived at
the orientation eating a breakfast sandwich.  As he attempted to
enter the room with another applicant, who was drinking a
beverage, Blitzer was stopped by Luciano Rivera ("Rivera"), a
human research specialist in the personnel services office of the
USPS's New York district.  In a "rude and disrespectful manner,"
Rivera explained to Blitzer and the other man that food and drink
were not allowed in the orientation.  Blitzer then asked him if
he could finish, to which Rivera brusquely responded, "Yes, but
hurry up," and indicated, through pointing to the hallway, where
Blitzer should eat.  Blitzer explains that he was "rather shocked
by Mr. Rivera's manner of speaking, especially since this was the
first contact [he] had with him."  In "a quiet aside" to the
other applicant, Blitzer remarked that Rivera's treatment of them

4

was "like the military," a comment which Blitzer does not know if Rivera overheard.

Once Rivera initiated the orientation, he informed those in attendance that while a "clean driving record" was a prerequisite for the position, there were no other "experience requirements." Rivera further told the applicants that during training, they would have to undergo a driving test, and that renting a U-Haul would be a wise way to prepare for such a test. Rivera explained to the applicants that if, at any point in their USPS employment, they did not have a clean driving record, "the union would do nothing" to help them. Rivera then instructed the applicants to complete PS Form 2591, the USPS's application for employment. Rivera noted that the USPS would hire from the "then active list until the next list came out," predicting that this would happen in June 1998. Collectively, these representations left Blitzer with the impression that "those who were not eliminated would be hired" and that hiring would be done in list order.

As Blitzer had difficulty understanding Rivera's instructions concerning the application with respect to listing periods of unemployment, Blitzer requested Rivera's assistance. Rivera "snapped" that Blitzer "ask[ed] too many questions." As submitted, Blitzer's application revealed that in the ten years from March 1988 through March 1998, his work history contained several periods of unemployment that totaled seven years and

seven months, including one period of unemployment that lasted over two and one-half years.  His longest period of employment, by contrast, lasted eight months.  Blitzer does not consider himself to have a stable work history.

At some point during the orientation, Rivera told the assembled applicants that Frances Velazquez ("Velazquez"), then a human resource specialist in the New York district's personnel services office, would be arranging interviews for applicants on or around March 9 and that the interviews would take place two to three weeks later.  Rivera also explained to the applicants that their orientation was supposed to include a tour of the postal handling facilities so that they could "become familiar with how the mail was handled."  Given the duration of the orientation, Rivera asked the applicants to vote as to whether they wanted to skip the tour in order to leave earlier.  After they unanimously voted in favor of forgoing the tour, Rivera then asked them if they were willing to represent that they had taken a tour if Velazquez asked during their interviews.  Again, all present agreed, although Blitzer found the request to be "suspicious."

At this point in the orientation, six or seven of the applicants, including Blitzer, were asked to complete a supplement to the application that inquired whether they had ever been convicted of a crime, had been fired from a job, or had resigned in lieu of being fired.  In response, Blitzer provided

two responses that he "anticipated might offend [a USPS] hiring official."  First, Blitzer noted that he had been terminated by the New York City Child Welfare Administration after six months of working as a caseworker and explained his termination as the result of his difficulties in ascertaining whether children were at imminent risk of harm if they remained in their homes. Specifically, Blitzer explained, after his supervisor accompanied Blitzer on a home visit to help him identify what does and does not constitute an imminent risk of harm to a child, the supervisor told him that casework was not the right job for him, thereby leading to his termination after "an unsuccessful attempt to find him a desk job."  Blitzer felt, however, that he needed to explain this situation so that USPS personnel officials would not think that he had committed negligence or wrongdoing while under the CWA's employ, particularly given some of the accusations surrounding CWA employees at the time.

With respect to his resignation from the New York City Taxi and Limousine Commission ("NYC TLC"), at which he served as a technical support aide for three months, Blitzer stated on the form that as the most recent hire, he was scheduled to be laid off for budgetary reasons but that the personnel director informed him that it would be in his best interest to instead resign as he had been late to work seven times in his short tenure.  Still visible on the form, although crossed out, was

Blitzer's assertion that the personnel director threatened that his career would be damaged if he didn't resign voluntarily.

After Blitzer finished filling out the supplement, Rivera escorted him and the other applicants required to complete the supplement to the anteroom of a large room, in which they waited to see William Andermann ("Andermann"), another human resource specialist with the New York District's personnel services office. Blitzer was the last applicant seated, and as such, the last person in line to meet with Andermann. For an hour and a half, Andermann silently "pushed the [applications] around on his desk" while wearing a "very strange expression of a kind of numb rage." Observing this behavior, Blitzer began to think "that [Andermann's] enraged behavior was triggered" by his application. When Andermann, who wore an "obviously exasperated look" on his face, called Blitzer in, he asked him in a facetious tone whether he drove a taxi, to which Blitzer responded that he had not driven a taxi but simply worked for the TLC and had been laid off. Andermann also inquired about Blitzer's termination from the CWA. Blitzer alleges that he remembers little of this portion of the conversation but that he assured Andermann that his termination occurred more than five years prior. Fearful that "a former boss might be saying something negative about [him] behind his back," Blitzer expressed his concern that he might be "blackballed" and asked Andermann if he could dispute

the USPS's failure to hire him, if such a result occurred.
Andermann said yes. Blitzer also sought to explain further the
details of his departures from the TLC and CWA, declaring that he
didn't want to lie to the federal government. At this point,
Andermann "patronizingly" placed his hand across Blitzer's back,
and guided him back toward Rivera's room.

Blitzer then had an individual conference with Rivera,
during which Blitzer asked if he could list a later availability
date on his application in order to take driving lessons to
"refresh [his] driving skills." Rivera consented to this request
and then asked Blitzer if he had ever served in the military.
Recalling Rivera's earlier remark that Blitzer asked too many
questions, Blitzer shot back, "You wouldn't want someone who
asked too many questions on the front lines, would you?"

After concluding his discussion with Rivera, Blitzer, along
with the other applicants, was then introduced to Velazquez, who,
to Blitzer's "amaze[ment]," was "wearing a rather short skirt"
for a person in authority. According to Blitzer's own complaint,
he "moved his upper torso to get a look" of Velazquez's skirt,
due to "[t]he normal male reaction at seeing a scantily clad
female." Velazquez's attire also aroused Blitzer's fear that she
would catch him looking at her legs and that he would suffer in
the application process as a result. Indeed, upon noticing
Blitzer staring at her, Velazquez "began laughing hysterically"

and walked away.  Blitzer believes that she shared this interaction with the other hiring officers with the intention of ensuring that Blitzer would not be hired; he does not allege, however, that she actually did so.

Blitzer and the other applicants were then sent to take a urine test.  As he waited in line, another applicant distributed Velazquez's phone number, explaining that those applicants who were not scheduled to be interviewed later that day should call her to schedule an appointment.  After Blitzer completed the test, he was released for the day.


Orientation Follow-Up and the Interview

Following the orientation, Blitzer took a number of steps to prepare for employment with the USPS.  On March 9, 11, and 17, for instance, Blitzer took driving lessons.  Similarly, on March 14, pursuant to Rivera's advice, he rented a U-Haul truck and practiced driving with a friend.  Additionally, on March 13, Blitzer called Velazquez and set up an interview for March 20. On the day of his interview, Blitzer arrived in a suit and waited for Sheree Ashe, who would be conducting his interview.  As he waited, Velazquez passed by and said, "Oh, hello, Mr. Blitzer" in what Blitzer perceived as an exaggeratedly high-pitched voice. Andermann then also walked by, trailing behind an African-American female in her twenties.  With a look of "fake surprise"

on his face, Andermann pointed his finger at the woman he was following.  Blitzer offers various interpretations of this gesture, but he thinks that Andermann's likely intention was either to demonstrate that any blame for a decision not to hire Blitzer should fall on other hiring officials or to purposefully embarrass himself in front of Blitzer so as to avoid hiring Blitzer.

At the beginning of the interview, Ashe asked Blitzer if he went on a tour of the handling facilities during his orientation.  After a moment's hesitation, he replied, "No."  Ashe then excused herself for approximately ten minutes, during which time Blitzer revised some information on his application with Ashe's consent.  Blitzer felt throughout the interview that Ashe had been "put up to something by someone," but nonetheless, when he asked her if he would be hired, she represented that he would, assuming that his references "check out and [he] pass[es] the physical."  Blitzer pressed Ashe for a time frame for her decisionmaking process; her reply was in the vein of "don't call us, we'll call you."

On April 8, Blitzer took the entry-level examination for the triborough district.  On April 20, he phoned the USPS personnel office, and Andermann answered.  Blitzer asked to make an appointment to take the medical exam, and Andermann told him that all carrier positions in the Bronx had been filled as of the

previous week and that they were only filling a few positions as needed."  Then, Andermann "rudely and abruptly hung up the phone."  Having read in the <u>New York Daily News</u> that the USPS was again accepting applications, on May 24, Blitzer returned to the Farley Post Office to obtain an application and saw Rivera on his way in.  According to Blitzer, Rivera's "facial expression indicated that he might not be thrilled with my presence."  When Blitzer left the building, and again saw Rivera, Rivera "hurriedly" and "nervously" started to talk with a group of women.

Upon returning home from the post office that day, Blitzer again called the USPS personnel office and reached Ashe.  After introducing himself and explaining that he interviewed two months earlier, she replied, "Only two months?"  Assuming on the basis of Rivera's representations that applicants would be hired in list order, Blitzer asked if his number had been reached on the list.  Ashe responded that the lists had been merged and that his list was combined with a prior list.  Blitzer then inquired as to whether he had been disqualified, which Ashe answered in the negative while instructing Blitzer to be patient.  At this point, Blitzer heard a third party, whom he believes to have been Velazquez, shout, "No pretty boys!  Don't blow us up!"  This made Ashe laugh "hysterically," and after thanking her, Blitzer hung up.

Approximately two months later, on July 31, Blitzer again phoned the personnel office, and a woman answered the phone. After he gave his name and explained that he was calling regarding the status of his application, the woman replied that she needed to ask Velazquez. With Blitzer on the line, the woman informed Velazquez of his call, and Blitzer overheard Velazquez direct her to tell him that they didn't have his driving abstract. Blitzer replied that they had obtained his driving information at the orientation and asked to leave his telephone number for Velazquez. Velazquez never returned Blitzer's call or otherwise contacted him regarding his driving abstract.

Initiating the EEO Process

One month later, on August 31, Blitzer went to the USPS EEO office and met with William McDonough ("McDonough"), to whom he explained his belief that USPS personnel officials, including Rivera and Andermann, had discriminated against him. Specifically, during the meeting, Blitzer explained to McDonough that "since the Hill-Thomas hearings, employers have been afraid to hire me, because they are afraid of a possible sexual harassment complaint." When Blitzer started to list the names of those involved, McDonough "excitedly said something about Bill and Lucky," which Blitzer understood as references to Andermann and Rivera. Blitzer then asked, "So they're your friends?"

McDonough replied, "That's why," which Blitzer interpreted as an explanation of why he wasn't hired.  Blitzer subsequently learned that a third party, who he has declined to name, listened in on this conversation through speakerphone.[1]  After Blitzer signed an agreement to mediate through the USPS's REDRESS program, McDonaugh gave him PS Form 2554-A, entitled "Information for Pre-Complaint Counseling."

The next day, September 1, Blitzer received a message from Velazquez on his answering machine, which stated:

> Hello, Andrew Blitzer, my name is Frances Velazquez.
> I'm calling from the Postal Service regarding your
> application for employment.  Your references did come
> in, and well, I'd like to discuss your employment
> history with you, and also, when I looked at your
> application, I also see that you were in college from
> '79 to 1960, I'm sorry, to June of 1990.  I need you to
> bring me court, not court, school transcripts
> reflecting or confirming that time period in school.
> That would cover a lot of the employment periods as
> well as the short employment, the temporary positions.
> . . . I'd like to schedule a meeting with you and I so
> we can talk, and also I would need you to bring in the
> school transcripts. . . . And then we'll start from
> there.  I can schedule you for medical if that's
> confirmed and after our talk.[2]

---

[1] In an addendum to his complaint, Blitzer notes that he will elaborate on this allegation "in front of a judge in order to protect the person who made this disclosure."

[2] In his opposition to the instant motion, Blitzer represents that he included a cassette tape, marked as Exhibit F, that included Velazquez's message and a later message left by Andermann.  This tape could not be located in Courthouse records, nor was a copy provided to this Court.  The above excerpt from Velazquez's message is taken from Blitzer's transcription as provided in his opposition brief, as is a later-provided excerpt from Andermann's message.

Because of his "past dealings" with Velazquez and his reluctance to speak with her without a third party present, Blitzer did not return her call.

On or about September 4, Blitzer returned to the USPS EEO office with a completed version of the form McDonough gave him, on which he alleged sex discrimination and "possibly, marital discrimination also," and represented that "if [he] were an attractive female," he would have been hired. Blitzer did not allege any discrimination on the basis of disability. In terms of what he sought as a resolution, Blitzer wrote "a carrier position, no retaliation, back pay, leave to take NYC civil service tests (they're usually held on Saturday) and go on interviews." Upon giving this form to an unnamed woman, Blitzer was informed that Andermann, of whose behavior he complained, would select a mediator and oversee the process.[3] When Blitzer objected to Andermann's involvement in his EEO complaint, the woman replied, "Then I guess they'll hire someone else for the day."

At some point during the week of his visit, Andermann also left a message on Blitzer's answering machine. After letting

_____

[3] Blitzer alleges that Andermann was simultaneously serving in a hiring and an EEO capacity, creating a conflict of interest. According to the Government, Andermann served as a human resource specialist in the personnel services office of the New York district from 1992 through July 1998. From July 1998 through September 2000, he held the position of EEO/ADR Specialist.

Blitzer know that he had spoken with Velazquez, Andermann

explained that

> we could do the mediation on Thursday or if this is
> acceptable to you, Ms. Velazquez got back two of your
> references, and they're basically okay.  There are two
> things that need to happen in order for you to be
> hired.  The first would be that you need to give
> another urine specimen because it's more than ninety
> days, and the second is, there was a period of time
> from '79 to '90 when you were in school.  If you could
> provide some type of a transcript from school that
> shows you were in attendance, that would be fine.  If
> you wanted to come in tomorrow to do a urine you could
> do that, you could go directly to Room 4503; if you
> still want the mediation on Thursday, you know, we'll
> do it.  Let me know today or early tomorrow what your
> intentions are.

When he returned Andermann's call, however, Andermann informed

him that he had been found "unsuitable."[4]  In response, Blitzer

told Andermann that he would like to pursue mediation and

complete the hiring process.  Andermann replied that Blitzer

could not do both and would have to choose.  When Blitzer

asserted that his interest in mediation stemmed from his

potential eligibility for back pay, Andermann also told him that

---

[4] Blitzer offers at least three versions of this
conversation.  In addition to the above-provided description, in
his November 13, 1998 complaint to the USPS Equal Employment
Opportunity ("EEO") office, Blitzer alleges that Andermann called
him and told him that he "should come in for a re-test of [his]
urine."  In this document, Blitzer states that he told Andermann
that while he wanted to retake the urine test, he also wanted to
proceed with mediation.  According to Blitzer, Andermann then
told him that he had to choose between those two courses of
action.  By contrast, at his deposition, Blitzer asserted that
Andermann "withdrew the offer to take the urine test after I said
I wanted to do the mediation."

he would not be eligible.

On September 9, Blitzer again took the entry-level examination for the Manhattan-Bronx district of the USPS. As he walked in, he was greeted by an unnamed man who said, "Hi, Andrew." Prior to the start of the test, another unnamed man gave instructions to those taking the exam regarding the importance of ensuring that others could not see their answers. He then came over to Blitzer's desk and "with an expression of mock meanness" moved Blitzer's papers in accordance with his instructions. Smiling at Blitzer, he also did the same with respect to the testing materials of an applicant seated in front of Blitzer.[5]

Mediation and EEO Counseling

Approximately one week later, on September 17, the mediation took place. In his papers opposing summary judgment, Blitzer alleges that during a "negotiating break," he offered to bring in the college transcript Velazquez had requested in her phone message and that Velazquez both refused and "rescinded the offer to begin the hiring process." Following the unsuccessful attempt at mediation, Blitzer then participated in two counseling

_____

[5] Through discovery, Blitzer requested that the Government provide the names of the two unnamed men. The Government's response to the relevant interrogatory stated that it did not know their names.

sessions, one on October 20 and another on November 3.  At the
October 20 session, Blitzer was introduced to Sandra Calo
("Calo"), an alternative dispute resolution ("ADR") specialist
with the USPS EEO office for the New York Metro Area ("NYMA"),
and was informed that McDonaugh would be observing their
counseling session.  Feeling "intimidated," Blitzer indicated
that he wanted to see a lawyer, and the meeting was adjourned.

At the November 3 counseling session, Calo interrupted
Blitzer's story, "somewhat mocking [his] assertion that things
were happening because he was a good-looking guy" and asking why
he didn't apply for a job with Burger King.  Blitzer found the
second comment to be particularly insulting, as he had in fact
applied unsuccessfully for a job at his local Burger King.  Calo
then showed him a copy of USPS eligibility requirements and
explained that the USPS declined to hire him on the basis of
these requirements.  Blitzer responded that the listed factors,
such as having an unstable work record, were meant to be applied
as a whole, and as he did not present any of the other
disqualifying factors, he should have been hired.  Blitzer also
brought with him a tape of the messages left for him by Velazquez
and Andermann and played it for Calo, after which she "loosened
up."  Calo then called Velazquez; no details of this conversation
have been furnished.

At the conclusion of the November 3 meeting, Calo gave

Blitzer a signed copy of PS Form 2579-A, which is entitled "Notice of Right to File Individual Complaint" and explains that in the event that the complainant's concerns have not been resolved through pre-complaint counseling, he or she has the right to file a formal complaint within fifteen calendar days. The form notes that a complaint can be handled only if it alleges discrimination on the basis of "race, color, religion, sex, national origin, age, disability, or retaliation for past EEO activity." The form also clearly states that a complainant "may not add matters which were not discussed during counseling."

The Formal EEO Complaint

Blitzer's formal complaint was received by the USPS EEO office on November 17, 1998. One week later, on November 25, Calo submitted an EEO Counselor's Inquiry Report, which describes her interviews of Velazquez and Andermann, both of whom denied discriminating against Blitzer. For his part, Andermann also denied having authority over the decision to not hire Blitzer; Velazquez, on the other hand, explained that Blitzer was not hired due to his unstable work history.

Throughout 1999 and 2000, in a series of correspondence with the compliance and appeals unit of the USPS EEO office for the NYMA, Blitzer contested the USPS's framing of the issues to be investigated. Ultimately, Blitzer's complaint was accepted for

investigation through a January 22, 2001 letter from Calo.  On
August 22, 2001, Calo completed the USPS EEO Investigation
Report, in which she reported that Blitzer had no prior EEO
activity that could support a claim of retaliation.  The report
noted management's explanation that Blitzer was not hired due to
his unstable work record and stated that of the 300 applicants
for the letter carrier position, the USPS hired 40 men, 20 women,
and 12 people whose sex was not clear from the information
available.  The remaining 228 applicants were not hired for a
variety of reasons, ranging from prior discharge from the USPS to
unstable work records.  Blitzer was notified that he had thirty
days following his receipt of the report to request a hearing
before an administrative judge or that alternatively, he could
receive a final agency decision without a hearing.  Through an
October 26, 2001 letter, Blitzer elected not to obtain a hearing.

On April 15, 2002, the USPS issued a Notice of Final
Decision with respect to Blitzer's complaint, in which it
concluded that Blitzer failed to establish a prima facie case of
sex discrimination or retaliation and observed that "being good
looking and unmarried are not protected categories" under Title
VII.  The decision further explained that even assuming that
Blitzer had established a prima facie case of discrimination on
the basis of sex, the USPS had articulated a legitimate,
nondiscriminatory reason for its failure to hire Blitzer -- his

unstable work history -- and that Blitzer had failed to counter this through admissible evidence.  The Notice of Final Decision explained that Blitzer had the right either to file a complaint in district court within ninety days or could instead appeal to the Equal Employment Opportunity Commission ("EEOC") within 30 days.  Blitzer chose the latter option.

On May 13, 2003, the USPS's decision was affirmed by the EEOC, which, after reviewing the record in its entirety, concluded that "the preponderance of the evidence of record does not establish that discrimination occurred."  The EEOC informed Blitzer of his right to sue in an appropriate federal district court within ninety days; Blitzer filed the instant action on August 13, 2003.

## Discussion

Summary judgment may be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Rule 56(c), Fed. R. Civ. P.; see also Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82 (2d Cir. 2004).  "The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment, and in assessing the record to

determine whether there is a genuine issue as to a material fact, the court is required to resolve <u>all ambiguities</u> and draw <u>all permissible factual inferences</u> in favor of the party against whom summary judgment is sought."  <u>Old Dominion Freight Line</u>, 391 F.3d at 83 (citation omitted) (emphasis supplied).

When the moving party has asserted facts showing that it is entitled to summary judgment, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" of the movant's pleadings.  Rule 56(e), Fed. R. Civ. P.; accord <u>Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.</u>, 302 F.3d 83, 91 (2d Cir. 2002).  If there is evidence, however, "from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper."  <u>Old Dominion Freight Line</u>, 391 F.3d at 83 (citation omitted).


I.    Federal Statutory Claims

    A.    Sex-Plus Discrimination

Claims of employment discrimination brought pursuant to Title VII are analyzed under the burden-shifting approach set forth in <u>McDonnell-Douglas Corp. v. Green</u>, 411 U.S. 792, 802-03 (1973).  A plaintiff bears the initial burden of establishing a prima facie case of discrimination.  <u>Williams v. R.H. Donnelly Corp.</u>, 368 F.3d 123, 126 (2d Cir. 2004).  To satisfy this burden,

a plaintiff alleging discrimination must establish that

> (1) he is a member of a protected class; (2) he is
> competent to perform the job or is performing his
> duties satisfactorily; (3) he suffered an adverse
> employment decision or action; and (4) the decision or
> action occurred under circumstances giving rise to an
> inference of discrimination based on his membership in
> the protected class.

Dawson v. Bumble & Bumble, 398 F.3d 211, 216 (2d Cir. 2005).

A plaintiff's burden in presenting prima facie evidence is de

minimis.  Abdu-Brisson v. Delta Airlines, Inc., 239 F.3d 456, 467

(2d Cir. 2001).

If the plaintiff establishes a prima facie case, he "creates

a presumption that the employer unlawfully discriminated, and

thus places the burden of production on the employer to proffer a

nondiscriminatory reason for its action."  James v. New York

Racing Ass'n, 233 F.3d 149, 154 (2d Cir. 2000)(citation omitted);

Mandell v. County of Suffolk, 316 F.3d 368, 380 (2d Cir. 2003).

Once the employer articulates a nondiscriminatory explanation,

the burden shifts back to the employee to prove, by a

preponderance of the evidence, that the adverse employment

decision was discriminatory.  Mandell, 316 F.3d at 381.  A

plaintiff's demonstration that the employer's proffered reason is

pretextual may provide evidence of discrimination.  Id.

The plaintiff bears the ultimate burden of persuading the

trier of fact that his employer intentionally discriminated

against him.  James, 233 F.3d at 154; see also Reeves v.

Sanderson Plumbing Prod., 530 U.S. 133, 153 (2000). "Thus, once
the employer has proffered its nondiscriminatory reason, the
employer will be entitled to summary judgment . . . unless the
plaintiff can point to evidence that reasonably supports a
finding of prohibited discrimination." James, 233 F.3d at 154.
To defeat summary judgment, "the plaintiff is not required to
show that the employer's proffered reasons were false or played
no role in the employment decision, but only that they were not
the only reasons and that the prohibited factor was at least one
of the 'motivating' factors." Back v. Hastings on Hudson Union
Free Sch. Dist., 365 F.3d 107, 123 (2d Cir. 2004) (citation
omitted). Nor is the plaintiff required to provide evidence that
similarly situated women were treated differently. Id. at 124.
Nonetheless, conclusory statements and general attacks on the
defendant's credibility are insufficient to defeat a motion for
summary judgment. Opals on Ice Lingerie v. Body Lines, 320 F.3d
362, 370 n.3 (2d Cir. 2003); see also Crawford El v. Britton, 523
U.S. 574, 600 (1998).

Blitzer alleges that he was discriminated against as an
"attractive male" and an unmarried man and describes both claims
as actionable under Title VII under the "sex-plus" rubric. As
the Second Circuit has explained, the term "sex plus" is "a
judicial convenience" that allows courts to find that a plaintiff
"can, under certain circumstances, survive summary judgment even

when not all members of a disfavored class are discriminated
against." Back, 365 F.3d at 118. Typically, the term denotes "a
policy or practice by which an employer classifies employees on
the basis of sex plus another characteristic." Id. at 118 n.7
(citation omitted). "[A]ll sorts of physical characteristics,"
presumably including a person's physical attractiveness, may be
among the non-sex factors on which an employer discriminates, and
which, coupled with gender discrimination, may give rise to a
sex-plus claim. Id. at 119 n.9 (citation omitted). So too may
an employer's invocation of "stereotypes presuming a lack of
domestic responsibilities for men" form the basis of a sex-plus
claim. Id. at 121 (citation omitted). Indeed, "sex plus marital
status" claims have been recognized by federal courts for
decades. Id. at 119 n.9; see also Bryant v. Int'l Schs. Servs.,
675 F.2d 562, 573 n. 18 (3d Cir. 1982); Stroud v. Delta Air
Lines, Inc., 544 F.2d 892, 893 (5th Cir. 1977); Sprogis v. United
Air Lines, Inc., 444 F.2d 1194, 1197-98 (7th Cir. 1971).

Viewing the facts in the light most favorable to Blitzer, he
has failed to establish a prima facie case not only as regards
discrimination against him as an attractive male, but also with
respect to his claim of discrimination on the basis of his sex
and marital status. First, Blitzer has offered only one piece of
admissible evidence -- the "No pretty boys!" comment that he
overheard during his telephone conversation with Ashe -- that

25

could give rise to an inference of discrimination based on his status as an attractive male. As the Government points out, however, Blitzer acknowledges that he does not know whether the comment pertained to him. He also admitted during his deposition that while he assumes Velazquez made that comment based on her earlier giggling at him during the orientation, he did not recognize the voice of the person who made the remark. At best, Blitzer has shown that at some point in time, Ashe and Velazquez worked in "close proximity" to one another.

As described in Blitzer's affidavit, Velazquez and the other four named employees behaved rudely or condescendingly during his respective interactions with them. Both at his deposition and in his affidavit, Blitzer has described how Rivera's treatment of him was "very rude," that Andermann displayed a "numb rage" and "condescending attitude" toward him and "patronizingly" steered him toward Rivera's office with his hand on Blitzer's back, that Velazquez giggled at him during the orientation, that McDonough was "nasty" to him, and that Calo mocked his claim that he was not hired due to his good looks. None of this conduct, however, gives rise to an inference that USPS staff discriminated against him as an attractive man. Blitzer has also failed to produce any evidence that similarly situated unattractive men and attractive women fared better in the hiring process, or that other attractive men suffered from discrimination.

Blitzer's allegation that he was discriminated against based upon his status as an unmarried male similarly fails to meet even his de minimis burden to produce prima facie evidence. In his affidavit, Blitzer asserts that some of his former employers have discriminated against him on the basis of his marital status, that discrimination against unmarried men is "endemic," and that the USPS's failure to hire him therefore must stem from a bias against unmarried men, who are perceived as needing less financial support due to their "freedom from familial responsibilities" and who bear the brunt of their married co-workers' jealousy and resentment due to such freedom. Yet these allegations cannot support an inference that USPS staff discriminated against Blitzer on the basis of his sex plus his marital status. Indeed, nowhere has Blitzer alleged that any USPS employee asked him about or remarked upon his marital status. Nor has he shown that any paperwork he filled out called for a disclosure of his marital status. It also bears mention that Blitzer has not supplied any evidence, much less suggested, that similarly situated men were not hired by the USPS for the letter carrier position due to their marital status.

Even assuming arguendo that Blitzer had established his prima facie case, however, the Government has proffered a legitimate, nondiscriminatory reason for the USPS's decision not to hire Blitzer: his unstable work history. In support of this

assertion, the Government offers several pieces of admissible evidence. First, it has provided Postal Service employment guidelines that state clearly that an applicant may be "eliminated from consideration for employment because of previous unsatisfactory service." These guidelines further define "previous unsatisfactory service" to encompass an "unstable work record," whether in the public or private sector. Second, drawing upon Blitzer's completed PS Form 2591, his application for employment with the USPS, the Government notes that Blitzer was unemployed for over seven of the ten years preceding his application. Third, the Government points out that at his deposition, Blitzer was shown the Postal Service guidelines referenced above and asked whether he considered himself to have a stable work history, which he answered in the negative.

Blitzer has not marshaled sufficient evidence to overcome the Government's proffered legitimate, nondiscriminatory reason for not hiring him. Although Blitzer alleges that Rivera told the applicants at the orientation that there were "no experience requirements" for the position of letter carrier and has produced an internal USPS document to the same effect, an applicant's inexperience is not irreconcilable with a requirement that he not have an unstable work history. Moreover, Blitzer has supplied no evidence indicating that the proffered reason for the USPS's decision not to hire him was pretextual by showing, for example,

that attractive and/or married female employees with similar work histories have been hired as letter carriers in the triborough area.[6]  Nor has he demonstrated, despite his contentions, that Velazquez and Andermann offered him employment through their September 1 telephone messages.  At most, these messages indicate that Blitzer had not yet been ruled ineligible for employment and that in order to continue the hiring process, he would need to bring them copies of his college transcripts as well as take another urine test.  Indeed, Velazquez's message explained that once she had Blitzer's transcripts, they could "start from there." (Emphasis supplied.)

More importantly, Blitzer has entirely failed to demonstrate that USPS employees subjected him to intentional discrimination. For example, Blitzer asserts that discrimination against unmarried men by their married counterparts is "a well-known fact," yet his only supporting evidence is a 1989 New York Times piece entitled "Young Men Pressed to Wed for Success."  While the article states that many companies expect men to be married by

_____

[6] Through an interrogatory, Blitzer requested that the Government provide him with "[a]ny documents showing that applicants with gaps in their work histories exceeding one year were hired between March 1997 and March 1999 in the Manhattan-Bronx Postal Service District."  The Government did not supply such data on the ground that such documents are protected by the Privacy Act, 5 U.S.C. § 552a, and on relevancy grounds as Blitzer's "work history for the ten years preceding his application the the [USPS] included a total of only two years and seven months of employment in approximately nine jobs, not simply a gap of one year."

age thirty, it also asserts that being single is an advantage in certain professions and that there is less pressure to marry by thirty in "service industries," in "smaller and younger companies," and in New York, which is described as "more tolerant of different styles of living." More significantly, even if Blitzer could prove that Velazquez was responsible for the "No pretty boys!" remark, which she has denied through her affidavit, "the stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination." <u>Abdu-Brisson</u>, 239 F.3d at 468. Therefore, Blitzer has not raised any questions of material fact as to whether the USPS's decision to not hire him was motivated by intentional discrimination on the basis of his sex.

B.  Retaliation

Title VII forbids discrimination against an applicant for employment "because he has opposed any practice made an unlawful employment practice . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" the auspices of that statute.  42 U.S.C. § 2000e-3(a).  The primary purpose of this provision is "maintaining unfettered access to Title VII's remedial mechanisms."  <u>McMenemy v. City of Rochester</u>, 241 F.3d 279, 284 (2d Cir. 2001) (citation omitted).

Courts apply the <u>McDonnell Douglas</u> burden-shifting approach to analyze claims of retaliation pursuant to Title VII. <u>Terry v. Ashcroft</u>, 336 F.3d 128, 141 (2d Cir. 2003). "In order to establish a prima facie case of retaliation, an employee must show (1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." <u>Feingold v. New York</u>, 366 F.3d 138, 156 (2d Cir. 2004) (citation omitted). For a plaintiff's conduct to constitute participation in a protected activity, it is enough that he has made "informal protests of discrimination, including making complaints to management." <u>Gregory v. Daly</u>, 243 F.3d 687, 700-01 (2d Cir. 2001) (citation omitted).

Moreover, "an employment practice need not actually violate Title VII for the protected activities element of a retaliation claim to be satisfied. The plaintiff is only required to have had a <u>good faith, reasonable belief</u> that he was opposing an employment practice made unlawful by Title VII." <u>McMenemy</u>, 241 F.3d at 285 (emphasis supplied.) Whether a plaintiff's belief is reasonable must be "assessed in light of the totality of the circumstances." <u>Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.</u>, 136 F.3d 276, 292 (2d Cir. 1998). As to the third prong of the test, a plaintiff may indirectly establish the causal connection needed for a prima facie case by "showing that the protected

activity was closely followed in time by the adverse action."
Cifra v. Gen. Elec. Co., 252 F.3d 205, 217 (2d Cir. 2001)
(citation omitted).

It is undisputed that Blitzer's protest of his treatment by
the USPS began with his August 31, 1998 visit to the USPS EEO
office, where he signed an agreement to mediate, and that his EEO
activity encompasses his submission of the pre-complaint form.
In addition, at various points in time, all of the named
employees, with the possible exception of Rivera, became aware of
Blitzer's EEO activity.  For instance, although Blitzer's
submissions are imprecise with respect to when certain USPS
employees learned of his complaints to the EEO office, Andermann
knew at the very latest by September 14, when he sent a letter to
Blitzer confirming his mediation, and Velazquez knew on or before
the September 17 mediation, in which she participated.  Moreover,
Blitzer's telephone conversation with Andermann, in which
Andermann informed Blitzer that he had been found unsuitable for
employment, occurred sometime between Blitzer's August 31 visit
to the USPS EEO office and Andermann's September 14 letter
confirming the mediation session.  The fact that only weeks, if
not days, elapsed between Blitzer's initiation of EEO processes
and the decision to not hire him could establish the causal
connection needed to fulfill the final prong of the prima facie
case.

Nevertheless, Blitzer's prima facie case suffers from a fatal flaw. As described above, the first requirement of a prima facie case for retaliation is that the plaintiff have a "good faith, reasonable belief" that the employment practice about which he complained constitutes a violation of Title VII. Even assuming that Blitzer "genuinely believed [him]self to be a victim of discrimination on the basis of [his] gender at the time []he made [his] protests," his belief that he had been discriminated against on the basis of sex, coupled with physical attractiveness and/or marital status, was not reasonable. Galdieri-Ambrosini, 136 F.3d at 292. As discussed earlier, Blitzer has not shown any "semblance of gender-oriented motivation in the events or conversations." Id. Therefore, Blitzer has not participated in protected activity, and he cannot establish a prima facie case of retaliation. As a result, the Government's motion for summary judgment as to Blitzer's Title VII retaliation claim is granted.

C. Disability Discrimination

A claim that the USPS discriminated against an employee or applicant for employment on the basis of disability is governed by the Rehabilitation Act. 29 U.S.C. § 791(b); Rivera v. Heyman, 157 F.3d 101, 103 (2d Cir. 1998) (federal employee's "sole claim for discrimination on the basis of disability is under the

Rehabilitation Act"). Such claims are analyzed under the same burden-shifting McDonnell-Douglas framework developed for use in Title VII cases. Reg'l Eco. Cmty. Action Program Inc. v. City of Middletown, 294 F.3d 35, 48-49 (2d Cir. 2002). In order to establish a prima facie case of disability discrimination under the Rehabilitation Act, a plaintiff must show "(1) that the plaintiff is handicapped within the meaning of the Act; (2) that the plaintiff is otherwise qualified to perform the job; (3) that the plaintiff was [not hired] because of his or her handicap; and (4) that the employer is a recipient of federal financial assistance" or a federal agency. Kinsella v. Rumsfeld, 320 F.3d 309, 314 (2d Cir. 2003).

As with his claims of discrimination on the basis of sex and retaliation, Blitzer has failed to establish a prima facie case of discrimination on the basis of disability. In his complaint, he states that his experiences with the USPS and its EEO office "ha[ve] understandably left me depressed, anxious, and made me have difficulty sleeping," resulting in his needing to seek psychiatric care. Nowhere has he alleged, however, that he was not hired on the basis of any real or perceived handicap, nor has he offered any admissible evidence that would support such an allegation. In fact, at his deposition, after giving a confusing explanation of the basis of his disability claim, Blitzer was asked, "Do you believe you were discriminated against because you

34

are disabled?" Blitzer responded, "No, but I want [the USPS] to have to accommodate a disability." Moments later, he reiterated, "That I was discriminated against because of a disability, no, that's not my intention." Coupled with a total lack of evidence to support an inference of discrimination on the basis of disability, these admissions preclude Blitzer from establishing a prima facie case for employment discrimination under the Rehabilitation Act.

Second, a plaintiff suing the federal government for employment discrimination under the Rehabilitation Act "must exhaust certain administrative remedies before initiating a lawsuit in federal court." Bruce v. U.S. Dep't of Justice, 314 F.3d 71, 74 (2d Cir. 2002). At no point did Blitzer initiate, much less complete, the appropriate administrative process with respect to his claim of disability discrimination. See, e.g., 29 C.F.R. §§ 1614.105-06, 1614.407. Therefore, summary judgment must be granted for the Government on Blitzer's Rehabilitation Act claim.

II. Constitutional Claims

A.  First Amendment Retaliation

Blitzer asserts that the USPS violated the First Amendment when it refused to hire him due to his criticism of the NYC TLC. The First Amendment protects public employees, as well as

applicants for public employment, from retaliation because of
their exercise of their right to freedom of speech.  See, e.g.,
Cobb v. Pozzi, 363 F.3d 89, 102 (2d Cir. 2004) (employees);
MacFarlane v. Grasso, 696 F.2d 217, 223 (2d Cir. 1982)
(applicants).  To warrant protection against retaliation under
the First Amendment, an employee or an applicant must express
himself "as a citizen on matters of public concern rather than as
an employee on matters of personal interest." Grillo v. New York
City Transit Auth., 291 F.3d 231, 235 (2d Cir. 2002).  "Whether a
[plaintiff's] speech addresses a matter of public concern must be
determined by the content, form, and context of a given
statement." Connick v. Myers, 461 U.S. 138, 147-48 (1983).

    In order to establish a prima facie case of retaliation in
violation of the First Amendment, as distinct from retaliation in
violation of Title VII, a plaintiff must show that "(1) his
speech addressed a matter of public concern, (2) he suffered an
adverse employment action, and (3) a causal connection existed
between the speech and the adverse employment action so that it
can be said that his speech was a motivating factor in the
determination." Pozzi, 363 F.3d at 102 (citation omitted).  If a
plaintiff satisfies this prima facie test, the Government may
avoid liability either by "(1) demonstrat[ing] by a preponderance
of the evidence that it would have taken the same adverse action
regardless of the protected speech; or (2) show[ing] that the

plaintiff's expression was likely to disrupt the government's activities, and that the likely disruption was sufficient to outweigh the value of the plaintiff's First Amendment expression."  Id.

_____The Government contends that as "Title VII is the exclusive remedy for discrimination in the workplace," all of Blitzer's constitutional claims should be dismissed.  See, e.g., Brown v. Gen. Servs. Admin., 425 U.S. 820, 834 (1976) (Title VII is "exclusive judicial remedy for claims of discrimination in federal employment.")  The Government's invocation of Brown is misplaced.  Although Title VII constitutes "the exclusive remedy for discrimination by the federal government on the basis of race, religion, sex, or national origin," Luckett v. Bure, 290 F.3d 493, 497 (2d Cir. 2002), Congress did not intend to prevent suits "for constitutional violations which Title VII provides no protection at all."  Ethnic Employees of Library of Cong. v. Boorstin, 751 F.2d 1405, 1415 (D.C. Cir. 1985).  In alleging that Andermann retaliated against him due to his criticism of non-USPS employees, Blitzer is not claiming that he suffered retaliation because he complained that he was a victim of discrimination, that is, a protected activity under Title VII.  Instead, Blitzer has moved outside of the realm of Title VII.

_____Nevertheless, Blitzer has failed to make out even a prima facie case of retaliation in violation of the First Amendment.

Blitzer alleges that by delineating the circumstances under which he resigned from the NYC TLC on the supplement to his employment application, he triggered Andermann's rage and condescension and that such treatment amounted to retaliation for Blitzer's having "exercised [his] First Amendment rights to criticize a member of [Andermann's] profession."  Blitzer was not speaking "as a citizen upon matters of public concern," but only as an applicant on matters of personal interest.  <u>Connick</u>, 461 U.S. at 147.  <u>See also</u> <u>Pozzi</u>, 363 F.3d at 104 ("one employee's dissatisfaction with her working conditions" not matter of public concern); <u>Tiltti v. Weise</u>, 155 F.3d 596, 602 (2d Cir. 1998) (employees' complaints about "nature of the work they were assigned and their pay" not a matter of public concern).

Moreover, Blitzer has neglected the third component of the prima facie case for retaliation under the First Amendment, failing to tie his criticism of personnel officers with whom he had previously dealt to an adverse employment action.  Instead, while Blitzer speculates that Andermann had "something to do" with the decision not to hire him, he has not pointed to a scintilla of evidence of Andermann's actual involvement in the hiring decision.  Consequently, the Government's motion for summary judgment as to Blitzer's First Amendment retaliation claim is granted.

B.  Due Process

Under a federal regulation promulgated by the EEOC, federal agencies must "[p]rovide for the prompt, fair and <u>impartial</u> processing of complaints."  29 C.F.R. § 1614.102(a)(2) (emphasis supplied).  An EEOC management directive elaborates on the requirement of impartiality, instructing agencies to "avoid conflicts of position or conflicts of interest as well as the appearance of such conflicts.  For example, the same agency official(s) responsible for executing and advising on personnel actions may not also be responsible for managing, advising, or overseeing the EEO pre-complaint or complaint processes."  <u>Agency and EEOC Authority and Responsibility</u>, <u>in</u> <u>EEO Management Directive 110</u>, 1999 WL 33318586 (Nov. 9, 1999).

Procedural due process rights attach to a "deprivation of interests encompassed within the Fifth Amendment's protection of life, liberty, and property."  <u>Rojas-Reyes v. INS</u>, 235 F.3d 115, 124 (2d Cir. 2000).  As the Second Circuit has succinctly stated, "[p]rocess is not an end in of itself."  <u>New York State Nat'l Org. for Women v. Pataki</u>, 261 F.3d 156, 164 (2d Cir. 2001) (citation omitted).  Rather, the constitutional import of process is to "protect a <u>substantive interest</u> in which the individual has a legitimate claim of entitlement."  <u>Id.</u> (citation omitted) (emphasis in original).  "[T]here is no constitutionally protected property interest in prospective government

employment." <u>Abramson v. Pataki</u>, 278 F.3d 93, 100 (2d Cir. 2002).

In his complaint, Blitzer alleges that his due process rights have been infringed because Andermann was "wearing two hats, serving both as a personnel officer and EEO/ADR Specialist in violation of the EEOC's own regulations." Blitzer further charges that the USPS EEO investigation of his complaint was less than complete, as it did not include interviews of Rivera and Ashe, and that he "strongly suspects that Andermann had a hand in the progress of the investigation." Even if Andermann's involvement in Blitzer's EEO process were found to constitute a violation of 29 C.F.R. § 1614.102(a)(2), however, Blitzer has asserted no protectable property interest that would enable him to state a due process claim. As a result, the Government's motion for summary judgment is granted as to Blitzer's due process claim.

C.  Equal Protection

Blitzer's final federal constitutional claim is phrased as "a cause of action for violation of constitutional rights, including equal protection." Blitzer's equal protection allegations focus solely on his interactions with Rivera, who, according to Blitzer's testimony, did not like him "[b]ecause [he is] an attractive male." Specifically, Blitzer believes that by

asking those assembled at the orientation to lie about taking a tour, Rivera intended to "set up" Blitzer as a liar during his interview with Ashe. Title VII is the exclusive remedy for an applicant for federal employment alleging employment discrimination. An applicant may not sue the Government for an equal protection violation arising from the same conduct. <u>See, e.g.</u>, <u>Graham v. Ashcroft</u>, 358 F.3d 931, 932 (D.C. Cir. 2004). The Government's motion for summary judgment is granted.


III. State-Law Claims

Lastly, aside from his federal statutory and constitutional claims, Blitzer has asserted claims against the USPS for invasion of privacy and breach of contract. With respect to his invasion of privacy claim, Blitzer alleges that an unnamed third party listened in on his conversations with McDonough via speakerphone. These facts do not state a claim under New York law, which does not recognize a common-law right of privacy and provides a statutory remedy only for the commercial use of a living person's name, portrait, picture, or voice without their consent. N.Y. Civ. Rights Law §§ 50-51; <u>Messenger ex rel Messenger v. Gruner + Jahr Printing and Publ'g</u>, 94 N.Y.2d 436, 440 (2000) ("New York does not recognize a common-law right of privacy.")

Moreover, even if Blitzer could make out a valid tort claim

based on these facts, the Federal Tort Claims Act ("FTCA") acts as the sole waiver of "the federal government's sovereign immunity against certain tort claims arising out of the conduct of its employees." Devlin v. United States, 352 F.3d 525, 530 (2d Cir. 2003). As such, the FTCA is the only vehicle by which a plaintiff may bring claims for non-constitutional torts against the United States and/or its agencies. 28 U.S.C. §§ 1346(b)(1), 2671-80; see also 39 U.S.C. § 409(c) (FTCA applies to "tort claims arising out of the activities of the Postal Service"). Under the FTCA, however, a plaintiff must "first present[] the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing" before instituting a tort claim against the government in federal district court. 28 U.S.C. § 2675(a). As Blitzer has offered no evidence that he filed an administrative claim with the USPS regarding his invasion of privacy allegations, the Government's motion for summary judgment as to this claim is granted.

Blitzer's breach of contract claim is similarly ill-fated. Blitzer alleges that the messages that Velazquez and Andermann left for him amount to binding oral contracts, and that by refusing to allow him to proceed with the hiring process, they were in breach. Yet neither of these messages constitutes an offer of employment, much less a binding contract. As defined in the Restatement (Second) of Contracts, an offer is "the

42

manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." Restatement (Second) of Contracts § 24 (1981). Velazquez's message displayed no "manifestation of willingness to enter into a bargain." Instead, she solely requested that Blitzer come in to discuss his employment history with her and stated that when and if he furnished her with his college transcripts from 1979 through 1990, "we'll <u>start</u> from there." (Emphasis supplied.) In a related vein, Andermann's message contained no offer but merely explained that "[t]here are two things that need to happen in order for [Blitzer] to be hired."

Blitzer also alleges that both Rivera and Ashe implicitly stated that he would be hired and that he reasonably relied on these representations in renting a U-Haul to practice his driving skills on March 14, 1998, and in taking driving lessons on March 9, 11, and 17 of that year. In order to succeed on a promissory estoppel claim, a plaintiff must show the following four elements: "(1) a promise, (2) reliance on the promise, (3) injury caused by the reliance; and (4) an injustice if the promise is not enforced." <u>Weinreb v. Hosp. for Joint Diseases Orthopaedic Inst.</u>, 404 F.3d 167, 172 (2d Cir. 2005) (citation omitted). Blitzer cannot show that either Rivera or Ashe made any promises to him. Rather, Blitzer states only that Rivera explained that

those without clean driving records "might as well leave now" and that the next person would be hired.

As for Ashe, Blitzer was asked at his deposition whether Ashe ever told him that he was in fact hired. He responded, "No. She said, 'If your references check out and you pass the medical,'" thereby admitting that Ashe made no promise to him. In addition, Blitzer's interview with Ashe did not take place until March 20. Therefore, even if her representations constituted a promise to hire him, he could not have relied on such promise with respect to the costs he incurred in taking driving lessons and in renting the U-Haul before March 20.

Even if Blitzer could establish that he had a valid contract for employment, however, his breach of contract claim must be dismissed for one other reason: It is largely duplicative of his Title VII claim and thus is preempted. The messages from Velazquez and Andermann, which serve as the foundation of Blitzer's breach of contract claim, are also described by him as "perhaps the most important demonstration of the fact that the defendant's stated reason for refusal to hire is purely pretextual." As suggested above, "when the same set of facts supports a Title VII claim and a non-Title VII claim against a federal employer, Title VII preempts the non-Title VII claim." Mathis v. Henderson, 243 F.3d 446, 451 (8th Cir. 2001) (citation omitted); see also Heyman, 157 F.3d at 105 (allowing plaintiff to

pursue state law discrimination claims alongside Title VII claims would allow him to "evade" the fact that Title VII "provides the sole remedy for federal employees alleging employment discrimination"). Like the <u>Mathis</u> court, this Court is "unwilling -- and under <u>Brown</u>, unable -- to give a plaintiff carte blanche to creatively plead . . . state-law causes of action" when at base, his claim is for employment discrimination on the basis of sex. <u>Mathis</u>, 243 F.3d at 451. For this reason, as well as the underlying lack of merit of this claim, summary judgment must be granted.

## Conclusion

For the above-stated reasons, the Government's motion for summary judgment is granted as to all claims. The Clerk of Court shall close the case.

SO ORDERED:

Dated:    New York, New York
         May 5, 2005

                                    DENISE COTE
                         United States District Judge